QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Stephen E. Frank*
111 Huntington Ave., Suite 520
Boston, MA 02199
Telephone: (617) 712-7100
Facsimile: (617) 712-7200
stephenfrank@quinnemanuel.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Alec A. Levy (SBN: 300779)
1300 I St. NW, Suite 900
Washington, DC 90017
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
aleclevy@quinnemanuel.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Rajat Rana*
295 5th Ave., 9th Floor
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
rajatrana@quinnemanuel.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kayla Francis (SBN: 354289)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
kaylafrancis@quinnemanuel.com

*Attorneys for Plaintiff-Relator*
*Harrison Metal Capital III, L.P.*
**pro hac vice forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA *ex rel.* HARRISON METAL CAPITAL III, L.P.,

Plaintiff-Relator,

v.

OLOF MATHÉ; and MIXMAX, INC.,

Defendants.

Case No.

**COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT**

**(*In Camera* and Under Seal)**
**(DO NOT PLACE ON PACER)**

**DEMAND FOR JURY TRIAL**

Plaintiff-Relator Harrison Metal Capital III, L.P. ("Relator"), on behalf of the United States of America ("Government" or "Federal Government") and against the above-named defendants Olof Mathé (resident of Sweden) and Mixmax, Inc. ("Mixmax" or "the company" and collectively with Defendant Mathé, "Defendants"), alleges based upon personal knowledge, relevant documents, information, and belief, as follows:

**NATURE OF THE ACTION**

1. While small American businesses fought to survive a global pandemic, Defendants Olof Mathé and Mixmax, Inc.—a Swedish CEO and his venture capital-backed Silicon Valley tech company—schemed to obtain over $1 million in taxpayer funds through the Small Business Administration's Paycheck Protection Program ("PPP") by falsely promising to use the money to preserve American jobs. But Mathé and his company had no intention of using the money to keep Americans employed. Instead, Mathé promptly *eliminated* American jobs and moved many of them to foreign countries as part of a pre-existing plan to build "a more global team." Meanwhile, despite representing to the government that Mixmax needed the PPP loan, Mathé *doubled* his own salary and, once the PPP loan was forgiven, cited Mixmax's financial health in support of his effort to raise even more money for the company from venture capital investors. The reality is this: Mixmax *never needed* the PPP money, did not use it for its intended purpose, and *should not have applied for it*. And Mathé was repeatedly warned of those facts by the company's investors, who told him that applying for the loan was potentially fraudulent. Mathé and the company ignored the warnings and forged ahead with a scheme to bilk the American people.

2. This action seeks to remedy this fraud by recovering damages and civil penalties on behalf of the United States for Defendants' knowing submission of false and fraudulent claims to the Government in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").

3. The timeline of Defendants' actions reveals calculated fraud, not pandemic distress. In January 2020—before COVID-19 began to impact American businesses—Mixmax completed a restructuring designed to reduce its burn rate and extend its operational runway. The restructuring plan projected that Mixmax would reach cash flow breakeven by December 2021, putting the company on a path to self-sustaining operations.

4. To fund this plan, Mixmax obtained a $2 million term loan from Silicon Valley Bank ("SVB"). With approximately $3.7 million in existing cash reserves plus the $2 million SVB loan, Mixmax had total available cash of approximately $5.7 million—enough to fund operations for a minimum of two years at the company's monthly burn rate of under $300,000. If Mixmax executed on its restructuring plan and reached cash flow breakeven in December 2021, the company would

achieve self-sustaining operations with effectively infinite runway. SVB's willingness to extend a $2 million term loan with a 42-month repayment schedule confirmed that a sophisticated lender had assessed Mixmax's financial projections and determined the company could repay principal and interest from operations.

5. When the pandemic hit, Mixmax's business—selling software to other businesses that use email in sales, marketing, recruiting, and customer service—continued to operate with minimal impact. The company faced no crisis. But when Congress announced the PPP program, Mathé saw an opportunity.

6. In April 2020, Defendants applied for a PPP loan in excess of $1 million (the "PPP Loan"). In support of the application, Mathé certified that the funds were "necessary to support the ongoing operations" of the Silicon Valley tech startup and would be used "to retain its workers and maintain its payroll or make its mortgage payments, lease payments, and utility payments." But that was false. In fact, Mathé was developing plans to *reduce* Mixmax's American workforce, regardless of whether Mixmax obtained the PPP funds, and move those jobs abroad. This was not about economic necessity. Mathé, who is Swedish, wanted to build a more globalized workforce, and have more of Mixmax's employees located near its foreign customers.

7. And that is exactly what he did. After receiving more than $1 million in American taxpayer funds, Mathé proceeded to implement his pre-planned firings. He replaced many of Mixmax's American workers with foreign employees in in Argentina, Brazil, Bulgaria, Canada, El Salvador, France, Mexico, Nicaragua, Nigeria, Philippines, Serbia, Spain, and Turkey—a transition that began with striking speed. Within just twelve days of receiving the PPP loan, Mixmax made its first payments to international contractors who had never before appeared in the company's books, and over the following months, over $700,000 went to such internationally based consultants and contract developers outside the United States.

8. Nor did Mixmax need the money for lease payments. In fact, with fewer workers employed in the United States, Mathé gave up office space—reducing the company's physical footprint in the United States—and cited the pandemic to his landlord as a basis to escape Mixmax's lease obligations. When the landlord asked whether Mixmax had received PPP funds to assist with

its lease payments, Mathé brushed off the question and, on information and belief, never told the landlord that Mixmax had received more than $1 million in PPP funds for exactly that purpose.

9. In December 2020, Mathé and Mixmax applied to have the PPP loan forgiven (the "PPP Loan Forgiveness Application"). At that time, Mathé falsely certified that Mixmax had used the PPP Loan to retain workers. In reliance on that false certification, the government in March 2021 forgave the PPP Loan in its entirety.

10. Less than two months later, Mathé doubled his own annual compensation to $400,000—a figure that made him one of the most well-compensated CEOs of similar-sized companies in Silicon Valley. Mathé also easily solicited another $7 million in equity capital for Mixmax from venture capital investors, citing Mixmax's financial health as a basis for the additional investment.

11. Defendants' loan fraud scheme was brazen. They secured more than $1 million in taxpayer funds by certifying that they would use the money to save American jobs, and instead fired American workers, offshored those jobs to thirteen different countries (Argentina, Brazil, Bulgaria, Canada, El Salvador, France, Mexico, Nicaragua, Nigeria, Philippines, Serbia, Spain, and Turkey), and gave Mathé a massive raise. They falsely certified that Mixmax needed the money—even as Mixmax's deep-pocketed investors were advising Mathé that this was not true and would potentially make him liable for fraud—and then cited Mixmax's financial health as a basis to raise even more money.

12. Based on the foregoing, *qui tam* Relator seeks through this action to recover damages, civil penalties, and other relief for the violations alleged herein.

## LEGAL FRAMEWORK

### I. The CARES Act and the Paycheck Protection Program

13. On March 27, 2020, just weeks after COVID-19 was deemed a pandemic by the World Health Organization, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), a $2 trillion emergency relief bill designed to support small businesses and preserve American jobs during a period of unprecedented economic turmoil. Among other things, the Act established the PPP program, administered by the Small Business Administration ("SBA"),

which provided small businesses access to hundreds of billions of dollars in forgivable loans administered through the pre-existing SBA 7(a) loan program.

14. PPP loans were intended to assist small businesses facing genuine hardship by helping them cover expenses such as payroll, rent, and utilities during the period of pandemic-related economic upheaval. Then-Senator Marco Rubio, Chairman of the Senate Committee on Small Business and Entrepreneurship and a principal architect of the PPP, explained that "[t]he congressional intent of the PPP program was to keep workers connected to their jobs and to ease the financial burden on small businesses so they could weather this pandemic."[1] The Treasury Department similarly stated the program "prioritizes millions of Americans employed by small businesses."[2]

15. Key aspects of PPP loans were that they were 100% government-guaranteed, approved for up to $10 million, could be forgiven if used on permitted costs such as payroll, rent, mortgage interest, and utilities, and had a *de minimis* interest rate, no guarantee or collateral requirement, and no prepayment penalty.

16. To obtain a PPP loan, an entity had to submit an application, signed by an authorized representative, affirming the company's eligibility and certifying that the loan proceeds would be used to "retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." The application further required the applicant to certify that it had made a good faith determination that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant." The application warned that "if the funds are knowingly used for unauthorized purposes, the federal government may hold [the signatory] legally liable, such as for charges of fraud."

---

[1] Press Release, S. Comm. on Small Bus. & Entrepreneurship, Rubio, Cornyn, Grassley, Wyden, Carper Introduce Bill to Clarify Small Business Expense Deduction Under PPP (May 6, 2020), https://www.sbc.senate.gov/public/index.cfm/2020/5/rubio-cornyn-grassley-wyden-carper-introduce-bill-to-clarify-small-business-expense-deduction-under-ppp.

[2] *Paycheck Protection Program*, U.S. DEP'T OF TREASURY, https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program (last visited Oct. 23, 2025).

17. The application required the applicant to provide information about its average monthly payroll expenses and number of employees, which was used to determine its eligibility and calculate the loan amount.

18. Borrowers could apply for forgiveness of the principal and interest on their PPP loans if they used the funds for qualifying business expenses. The forgiveness certifications required an attestation, among other things, that the loan funds had been "used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments)" and that the "Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness." Initially, the program required that at least 75% of the loan proceeds had been used for payroll costs in order to qualify for forgiveness. This requirement was later reduced to 60% in June 2020.

19. The forgiveness application included extensive warnings about penalties for false statements.

## II. <u>The False Claims Act</u>

20. The FCA was enacted after the Civil War to permit the Government to recover losses sustained as a result of fraud against it. The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the Government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) conspiring to violate any of these sections. 31 U.S.C. §§ 3729(a)(1)(A)-(B), and (G).

21. Any individual or entity who violates the FCA is liable for a substantial civil penalty for each violation, in addition to three times the amount of damages sustained by the United States. 31 U.S.C. § 3729(a)(1). The FCA also allows any person having information about an FCA violation to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that such complaint be filed under seal for a minimum of 60 days (without service on Defendants during that time) to allow the Government time to conduct an independent investigation and determine whether to join the suit.

## PARTIES

22. Relator Harrison Metal Capital III, L.P. is a Delaware limited partnership with its principal place of business in Jackson, Wyoming. Harrison Metal invests capital in early-stage ventures on behalf of its general partner and limited partners, including university endowments, charitable trusts, and pensioners' savings plans. Michael Dearing is the managing member of Harrison Metal's general partner. Harrison Metal led Mixmax's October 2014 seed funding round and is Mixmax's largest stockholder, owning approximately 18% of outstanding shares.

23. As Mixmax's largest stockholder, Harrison Metal holds contractual information rights and a designated Board seat under its investment agreements. Harrison Metal's board designee did not occupy the Board seat during the relevant time period, but Harrison Metal retained its contractual information rights throughout. Through these rights and Dearing's direct communications with Mathé in April 2020 regarding the propriety of Mixmax applying for PPP funds, Harrison Metal has direct and independent knowledge of the facts alleged herein.

24. Defendant Olof Mathé holds dual Swedish and American citizenship and is, on information and belief, a part-time resident of both California and Sweden. He serves as Chief Executive Officer and Chairman of the Board of Directors of Mixmax. Mathé is one of Mixmax's three co-founders and currently owns approximately 15% of the company's outstanding shares. Mathé signed and submitted the PPP Loan Application on April 30, 2020, and the PPP Loan Forgiveness Application on December 11, 2020. Mathé signed all the false certifications alleged in this Complaint and was the architect of the fraudulent scheme described herein.

25. Defendant Mixmax, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Mixmax develops and sells subscription-based internet applications designed to enhance business clients' use of email.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

27. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a)'s authorization of nationwide service of process and because Defendants' principal place of business is located in California.

28. Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transacted business in this district, and because violations of 31 U.S.C. §§ 3729 *et seq.* alleged herein occurred within this district. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district.

## <u>FACTUAL ALLEGATIONS</u>

### A. Mixmax's Pre-PPP Financial Condition and Pre-Application Planning

29. Founded in 2014 by Olof Mathé, Bradford Vogel, and Chanpory Rith, Mixmax is a venture capital-backed software-as-a-service ("SaaS") company. Silicon Valley technology startups like Mixmax typically operate on a venture capital funding model, in which investors provide substantial initial capital to fund operations during the period before the company can generate its own cash flow from customer payments sufficient to cover its expenses (referred to as "cash flow breakeven"). Startup companies like Mixmax typically calculate their "burn rate"—the monthly rate at which they spend cash reserves—and their "runway"—the number of months of operations their current cash reserves will support before they must either raise additional capital from investors or generate sufficient cash from operations to break even or turn a profit. Routinely, companies manage their "runway" by throttling spending relative to revenue.

30. Before the pandemic, Mixmax reported approximately $10 million in annualized revenue and millions of dollars in cash reserves. It was backed by major venture capital investors—including Harrison Metal, Creandum, SaaStr Fund, and Resolute Partners—with tens of millions of dollars in available capital between them.

31. In January 2020, Mixmax's Board approved a restructuring plan designed to reduce the company's burn rate and extend its operational runway. The restructuring plan projected that Mixmax would reach cash flow breakeven by December 2021, putting the company on a path to self-sustaining operations. The plan included reducing the company's workforce by approximately

15%, cutting non-headcount expenses, securing a $2 million term bank loan, and subleasing office space.

32. Following the restructuring, Mixmax had approximately $3.7 million in cash reserves. Combined with the $2 million SVB term loan, Mixmax had approximately $5.7 million in total available cash. At the company's burn rate of under $300,000 per month, this gave Mixmax over two years of operational runway extending well into 2022. If Mixmax executed on its restructuring plan and reached cash flow breakeven in December 2021, the company would achieve self-sustaining operations with effectively infinite runway. The fact that SVB provided Mixmax a $2 million term loan requiring repayment over 42 months further demonstrated that Mixmax had a credible path to profitability—banks do not typically make loans to companies that cannot demonstrate the capacity to repay them. Mixmax was exceptionally well-positioned as compared to other Silicon Valley SaaS tech startups. As COVID-19 began impacting many American businesses in March 2020, Mixmax's situation remained relatively stable. Unlike restaurants that were forced to close their doors and retailers whose foot traffic vanished, Mixmax—a software company with a workforce capable of operating remotely—continued to operate with minimal disruption.

33. While some of Mixmax's business metrics arguably showed minor pandemic impact, these reflected, at most, softening, not crisis. For example, revenue from customers who signed up directly through Mixmax's website declined by less than 1% during the first two weeks of lockdown in March, and some sales cycles were temporarily extended or paused. But thanks to its pre-COVID restructuring, Mixmax had substantial resources to weather temporary revenue fluctuations. It also had continued access to its deep-pocketed investors.

34. Despite these substantial financial resources, Mathé sought an over $1 million taxpayer windfall. His internal planning documents from the weeks before applying for the PPP loan show that he planned to implement workforce reductions regardless of whether he obtained the loan. For instance, a "burn budget" dated April 23, 2020—seven days before Mathé submitted the PPP Loan Application—analyzed various revenue and expense scenarios, and contemplated a 20% reduction in Mixmax's "headcount cost" beginning six months later. The financial model included

a toggle for PPP loan receipt, but the 20% headcount cost reduction applied regardless of whether that toggle was set to receive PPP funds or not. In other words, even as he was preparing to certify to the government that Mixmax required PPP money to "retain workers and maintain payroll," Mathé was planning to *expand on the 15% job cuts* the Board of Directors had already approved months earlier. The Defendants had no intention of using PPP funds to "retain" American workers. They intended the opposite—to *fire* American workers, regardless of whether they obtained PPP money. And that is exactly what they did.

35. On April 8, 2020, Mathé convened a Board meeting to discuss obtaining PPP funds for Mixmax. After the meeting, several of the company's major investors warned Mathé that seeking PPP funds would be improper given Mixmax's secure financial position.

36. For example, on April 10, 2020, Raanan Bar-Cohen—a representative of Mixmax investor Resolute Ventures—sent Mathé an email in which he wrote: "Absent unique circumstances, we would not recommend applying for a loan under the PPP." Bar-Cohen explained that the PPP loan application would require certifying that "current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant," adding, "We read this to imply that the business would be imperiled in the near term without the loan." Bar-Cohen cautioned Mathé that "the penalties for knowingly making false statements in the application include substantial fines and even imprisonment." Bar-Cohen emphasized that "these severe consequences should give any company pause" and that enforcement decisions "will, of course, be made with 20/20 hindsight."

37. Likewise, plaintiff Michael Dearing warned Mathé: "There is a good case to make that the loan program was never intended for companies like Mixmax and that our current financial situation should be disqualifying." And he wrote, "Increasingly, your peers—tech companies with significant runway and only modest COVID related impact to their business so far—are opting not to apply for these loans."

38. Mathé responded that Dearing's "concern is top of mind," adding, "I agree that the program leaves room for interpretation, especially this wording: 'The current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant.'" Still, Mathé forged ahead.

39. At or about the same time, Mathé and another Mixmax employee drafted notes saved under the filename "necessity of cares"—a reference to the CARES Act and the PPP loan program. The notes indicated that, without additional funding, Mixmax would need to draw down its bank loan, reduce non-headcount expenses by 20 percent, and reduce headcount expenses by 15 percent in order to achieve cash flow break-even. In the comments, Mathé wrote, "Is there an argument that with PPP we a) can postpone a headcount reduction or b) is it that it limits the size of the reduction?" The document concluded, "Considering the circumstances, Mixmax believes that the tactics discussed are exhaustive and do not provide us with enough runway so we can confidently state that the PPP Loan is a necessity to keep Mixmax afloat." This was a false and manufactured rationale. In the comments, Mathé himself wrote, "it's about limiting headcount reduction?"

40. A subsequent version of the document, dated April 15, 2020, began as follows: "We believe that Mixmax needs to apply for the PPP loan in order to limit the magnitude of any future reduction in headcount." The note continued, "We have since modeled several scenarios to become a cash flow breakeven business in the current economic environment. This is only possible with a headcount reduction, and PPP helps reduce the magnitude of the reduction." Again, this was false—Defendants intended to reduce Mixmax's headcount by approximately 20 percent and move jobs abroad *regardless* of whether the company received a PPP loan.

41. Ultimately, Mixmax's investors—relying on Mathé's representations that Mixmax needed PPP funds to sustain its operations and "limit the magnitude of any future reduction in headcount" —acceded to Mathé's demand to amend the company's Investors' Rights Agreement in a manner that Mathé insisted was necessary for the company to seek PPP funds without running afoul of certain regulatory requirements. The changes eliminated restrictions on Mathé's ability to incur debt exceeding $500,000 or to change executive compensation without the approval of Mixmax's Board or major investors.

**B. The False PPP Loan Application and Receipt of PPP Funds**

42. On April 30, 2020, Mathé, in his capacity as Mixmax's CEO, submitted a PPP Loan Application on behalf of Mixmax in which he falsely certified that that (i) the loan proceeds would be used to "retain workers and maintain payroll or make mortgage interest payments, lease

payments, and utility payments, as specified under the Paycheck Protection Program Rule," and (ii) that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant."

43. Mathé's certification was false because he did not intend to use the loan proceeds to retain American workers and because Mixmax did not require PPP funds to support its ongoing operations. Instead, Mathé planned to *reduce* the company's American workforce and to hire foreign workers to replace them. All this was part of a pre-planned effort to globalize Mixmax's workforce, lower its operating costs, extend its already healthy operational runway, and either raise additional investor dollars or sell the company, all while allowing Mathé to give himself a massive raise.

44. On May 1, 2020, based on Mathé's false representations, SVB granted Mixmax a PPP loan in the amount of $1,116,698, fully guaranteed by the SBA.

**C. Post-Funding Evidence Confirms the Certifications Were False**

45. Between May and October 2020, Mixmax followed through with its plan to eliminate American jobs and to hire employees across thirteen countries: Argentina, Brazil, Bulgaria, Canada, El Salvador, France, Mexico, Nicaragua, Nigeria, Philippines, Serbia, Spain, and Turkey. Over that time period, Mixmax reduced its overall headcount by more than 20 percent—consistent with Mathé's pre-existing plan.

46. Mixmax's financial records reveal how quickly the offshore transition began. Within 12 days of receiving the PPP loan, the company made its first payments to international contractors who had never appeared in its general ledger. As U.S. workers were being terminated throughout the following months, Mixmax began paying contractors located in Argentina, Turkey, and other foreign jurisdictions. By October 2020, the company started using Deel, a third-party platform specifically designed to facilitate payments to international contractors and employees outside the United States. During the period following the PPP loan, over $700,000 was paid to international consultants and contract developers—none of whom were in Mixmax's financial records before the loan.

47. At the same time, in April 2020, Mathé unilaterally increased his own compensation to $235,685—an increase of nearly 31 percent.

48. In July 2020, Mixmax held an all-hands meeting. In notes prepared for the meeting, dated July 7, 2020, Mathé addressed why Mixmax "took a $1-2m Paycheck Protection Program loan (US gov $), then laid off US workers to hire non-US workers." In his draft response, Mathé wrote, "There's a lot to unpack in this question." He falsely suggested that the PPP loan, the workforce reductions, and the offshore hiring were "three separate things . . . decisions made independently," writing: "We're hiring in EMEA time zones for two reasons. First, this is the more important reason, because I am Swedish, and b/c we as founders want a more global team. Note that one of our main investors is also Europe's most successful VC firm, Creandum. Second, because we want to be where our customers are, 35% of extension installs are outside of North America."

49. Financial records prove that the PPP loan, workforce reductions, and offshore hiring were not "three separate things" as Mathé claimed. International contractor payments began within days of receiving the PPP loan. By the time of this July meeting, Mixmax had already paid tens of thousands of dollars to contractors in Argentina and Turkey who had not appeared in its books before the loan. Rather than using the loan to retain American workers as certified, Mathé directed available resources toward building a "more global team"—on American taxpayers' dime and at U.S. workers' expense.

50. Elsewhere in the document, Mathé acknowledged, "Over time we'll have more teammates across more functions in EMEA time zones." And, he added, one of the reasons Mixmax was hiring in Latin America and Europe was because "those timezones provide us with the ability to hire the experience level we are looking for and pay competitive wages." Mathé thus *admitted* that he had fired U.S. workers and moved their jobs abroad in part to save money—because foreign employees typically earn less than their U.S. counterparts.

**D. The False PPP Loan Forgiveness Application**

51. Having raised his own compensation while firing workers—in contravention of his representations to the government—Mathé moved to complete his fraud by seeking forgiveness of

the PPP loan.

52. On December 11, 2020, Mixmax submitted a PPP Loan Forgiveness Application in which he falsely certified that the loan funds had been "used to pay costs that are eligible for forgiveness (payroll costs to retain employees)." In fact, Mixmax's headcount had *declined* from 48 at the time of the loan application to just 35 at the time of the forgiveness application—a reduction of more than 25%. And Mathé failed to tell the government that the job cuts were pre-planned; that Mathé had moved jobs abroad; that he had never intended to use the PPP money to preserve American jobs; that Mixmax never needed the PPP money in the first place, and secured it over the warnings of its own investors that applying for the loan could constitute fraud; and that Mathé increased his own compensation by nearly 31% over the same period, underscoring that the company was not struggling to survive.

53. Indeed, in an update to Mixmax's Board of Directors that same month, Mathé trumpeted the fact that since July 1, 2020, Mixmax had "hit or exceeded our targets on all metrics" with the exception of a single month. He noted that September and October "were the strongest growth months we've had in the past 12 months" (which included pre-pandemic months). He also noted that Mixmax was continuing to hire employees, having filled four positions since June—all of them in Europe and Latin America—with four positions still open (also, all in Europe). He concluded by noting that Mixmax had more than $4 million in available cash, an operational runway of greater than 20 months, and, as a happy windfall on top of all of that, still expected "100% forgiveness" of its PPP loan.

54. Yet even as Mathé was boasting about Mixmax's financial success to its Board, he was asking the company's landlord to release it from certain of its lease obligations, falsely claiming that "[t]he pandemic has been hard on our business," and inquiring "if there was any flexibility on your end to share some of the burden of the lockdown." That is, Mathé was asking his landlord to "share some of the burden of the lockdown," while in reality Mixmax was not itself burdened by the lockdown but was instead financially healthy and sitting on a stockpile of cash, and had just massively increased Mathé's compensation.

55. In response, the landlord's representative asked Mathé to provide "supporting information" that would "illustrate why you *need* rent relief (vs simply *wanting* rent relief)," adding, "Also, has Mixmax received any PPP or EIDL money?" In a subsequent email, the landlord's representative wrote, "it would be a hard sell if a company still has a significant cash position, received meaningful PPP funds, etc. and could make the rent payment but generally didn't feel like it."

56. Of course, that was *precisely* Mixmax's position—as Mathé knew. Just weeks before contacting the landlord in December 2020, Mixmax disclosed to its Board that it had over $4 million in available cash and more than 20 months of runway. Mixmax's landlord—apparently unaware of these facts—ultimately provided Mixmax with a modest rent reduction, while Mathé, on information and belief, simply deflected the landlord's inquiry about Mixmax's cash position and ignored its question about whether Mixmax had received PPP funds.

57. On March 11, 2021, in reliance on Mathé's false certifications concerning Mixmax's use of the loan money to retain American workers, the government forgave the full balance of the PPP Loan in the amount of $1,116,698, plus accrued interest.

**E. Post-Forgiveness Enrichment & Entrenchment**

58. Less than two months after obtaining forgiveness of the PPP Loan, Mathé granted himself a second, massive compensation increase that was even bigger than the first. In all, his new compensation package included a base salary of $300,000 and a bonus of up to $100,000. The total potential pay of $400,000 represented an increase of nearly 70% from the higher salary Mathé had awarded himself just one year earlier. And it was more than double his pre-PPP salary of $180,000. According to OptionImpact, Mathé's new base salary alone placed him at the 90th percentile for CEOs of comparably technology companies.

59. Mathé's compensation increases during and immediately after the PPP covered period, combined with the workforce reductions, underscore that his certifications were false. Mathé certified that his company needed to take taxpayer funds under a program designed to protect American workers' paychecks because those funds were necessary to "retain workers." He then increased his own compensation by 122% while firing more than 20% of his American workforce

and offshoring their jobs—as part of a preexisting plan to globalize Mixmax's workforce while saving money on cheaper foreign labor.

60. Having successfully enriched himself through the PPP fraud, Mathé raised $7 million in new equity capital from existing affiliates and new investors—underscoring that Mixmax had ready access to private funding and never needed taxpayer assistance in the first place.

**FIRST CAUSE OF ACTION**

**False Claim Act (Submission of False Claim)**

**31 U.S.C. § 3729(a)(l)(A)**

61. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

62. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

63. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, by way of their deliberate ignorance, reckless disregard, and actual knowledge, false or fraudulent claims to the United States for payment or approval.

64. Specifically, Defendants presented or caused to be presented the following false claims to the United States:

a. The PPP Loan Application dated April 30, 2020, seeking $1,116,698 in PPP loan funds, which contained false certifications that the loan was necessary to support ongoing operations and would be used to retain workers;

b. The PPP Loan Forgiveness Application dated December 11, 2020, seeking forgiveness of the full $1,116,698 loan amount, which contained false certifications that the funds were used to retain employees.

65. Those claims were false because:

a. The PPP Loan was not necessary to support Mixmax's ongoing operations. Following its January 2020 restructuring, Mixmax had approximately $3.7 million in existing cash reserves plus a $2 million SVB term loan, for total available cash of approximately $5.7 million. At the company's burn rate of

under $300,000 per month, this provided a minimum of two years of runway. Moreover, the Board had approved a financial plan projecting the company would reach cash flow breakeven by December 2021, giving Mixmax a path to self-sustaining operations and effectively infinite runway. SVB's extension of a $2 million term loan with a 42-month repayment schedule confirmed the bank's assessment that Mixmax could repay the loan from operations, further demonstrating the company's strong financial position. The company had ready access to additional investment in the ordinary course of its business, and had recently completed a successful restructuring;

b. The PPP Loan was not used to retain workers. Defendants reduced the company's workforce by 27% during the covered period, executing *pre-planned* workforce reductions documented in burn budget models created before Defendants submitted the PPP Loan Application.

c. Rather than using the PPP Loan to retain American workers, Mathé used the funds and resulting financial flexibility to increase executive compensation while reducing the company's workforce by over 25%. According to payroll records, Mathé's base salary increased from $180,000 to $235,000 effective April 1, 2020—the month PPP funds were received. And less than two months after obtaining full forgiveness of the PPP Loan in March 2021, Mathé increased his total compensation to $400,000 annually—more than double his pre-PPP salary of $180,000;

d. During this same period, Defendants also directed resources to offshore contractors across thirteen countries (Argentina, Brazil, Bulgaria, Canada, El Salvador, France, Mexico, Nicaragua, Nigeria, Philippines, Serbia, Spain, and Turkey). Within 12 days of receiving the PPP loan, Defendants began paying international contractors who had never appeared in Mixmax's books, with over $700,000 ultimately going to internationally based consultants and contract developers outside the United States. Defendants' pattern of

executive enrichment, workforce reductions, and offshore spending was completely contrary to their certification that taxpayer funds would be used to retain American workers.

66. Defendants knew these claims were false when presented, or acted in deliberate ignorance or reckless disregard of their truth or falsity, as evidenced by:

a. Mixmax's strong financial position at all times—which included (i) approximately $5.7 million in total available cash in January 2020 that provided a minimum of two years of operational runway, (ii) over $4 million in cash in December 2020 that secured more than 20 months of remaining runway, (iii) board-approved financial plans projecting cash flow breakeven by December 2021, (iv) SVB's extension of a $2 million term loan with a 42-month repayment schedule, and (v) ready availability of venture capital investments;

b. Pre-application burn budget documents showing planned workforce reductions regardless of whether Mixmax received PPP funds;

c. Explicit warnings from investors about certification requirements and criminal penalties for false statements;

d. Executive compensation increases for Mathé, with his base salary rising from $180,000 to $235,000 in April 2020 when PPP funds were received, followed by further increases to approximately $400,000 annually by early 2021, while the company executed the pre-planned workforce reduction;

e. The forgiveness application itself reporting a workforce reduction of over 25% while certifying funds were used to "retain employees";

f. Offshore hiring across thirteen countries (Argentina, Brazil, Bulgaria, Canada, El Salvador, France, Mexico, Nicaragua, Nigeria, Philippines, Serbia, Spain, and Turkey), replacing terminated U.S. workers with foreign labor rather than retaining American employees;

g. The post-forgiveness increase in Mathé's compensation to $400,000 (90th percentile), demonstrating that PPP funds were used for executive enrichment rather than worker retention.

h. Financial records showing international contractor payments beginning within 12 days of receiving the PPP loan—to contractors who had not previously appeared in Mixmax's books—with over $700,000 ultimately going to such contractors, evidencing that the offshore transition was prepared for immediate execution upon receipt of PPP funds;

i. Financial disclosures to stockholders in December 2020 showing over $4 million in available cash with more than 20 months of remaining runway.

67. The false statements and certifications were material to the Government's decision to approve the PPP Loan and subsequently forgive it. The certifications about economic necessity and worker retention were mandatory conditions for both loan approval and forgiveness. The Government would not have approved or forgiven the loan but for Defendants' false representations.

68. By reason of Defendants' acts, the United States has been damaged in the amount of $1,116,698 in principal, plus accrued interest, representing the full amount of the fraudulently obtained and forgiven PPP Loan. The United States continues to be damaged and is entitled to additional relief as determined at trial.

69. The United States is entitled to treble damages of $3,379,221.21, plus civil penalties for each false claim presented. Under 31 U.S.C. § 3729(a)(1), civil penalties range from $14,308 to $28,619 per violation. Defendants presented multiple false claims through the loan application, forgiveness application, and related certifications, each of which constitutes a separate violation subject to civil penalties.

## <u>SECOND CAUSE OF ACTION</u>

**False Claims Act (Making False Statement in Support of a Claim)**

**31 U.S.C. § 3729(a)(l)(B)**

70. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

71. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

72. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, by way of their deliberate ignorance, reckless disregard, and actual knowledge, false or fraudulent records or statements material to false or fraudulent claims.

73. Specifically, Defendants made or caused to be made the following false records or statements material to false claims:

a. False certifications in the April 30, 2020 PPP Loan Application that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant" and that funds would be used to "retain workers and maintain payroll";

b. False certifications in the December 11, 2020 PPP Loan Forgiveness Application that funds "w[ere] used to pay costs that are eligible for forgiveness (payroll costs to retain employees...)" and that "[t]he information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects";

c. False certification in the PPP loan Forgiveness Application that PPP funds were used to "retain employees," even though, as the application acknowledged, reporting the company actually reduced its workforce by more than 25%.

74. These statements and records were material to the Government's payment of the PPP Loan and forgiveness of the PPP Loan. The false statements went to the heart of eligibility for the loan and forgiveness—whether the loan was necessary and whether it would be and was used to retain workers.

75. Defendants knew these statements and records were false when made, or acted in deliberate ignorance or reckless disregard of their truth or falsity, for the reasons set forth above.

76. The United States, unaware of the falsity of these statements and records, approved the PPP loan and provided forgiveness, which would not have occurred but for Defendants' false statements.

77. By reason of Defendants' violations of 31 U.S.C. § 3729(a)(1)(B), the United States has been damaged, and continues to be damaged, in the amount of $1,116,698, plus accrued interest.

78. The United States is entitled to treble damages, plus civil penalties as provided by 31 U.S.C. § 3729(a)(1), as adjusted for inflation, for each false statement made in support of a false claim.

## **PRAYER FOR RELIEF**

WHEREFORE, *qui tam* Relator prays for judgment against Defendants as follows:

1. That this Court enter judgment against Defendants in an amount equal to three times the damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $14,308 and not more than $28,619 for each violation of 31 U.S.C. § 3729;
2. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);
3. That Relator be awarded all costs of this action, including attorney's fees and expenses; and
4. That Relator recover such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED: January 5, 2026

Respectfully submitted,

By /s/ *Kayla Francis*

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*Attorneys for Plaintiff-Relator Harrison Metal Capital III, L.P.*